Daniel Michael
C. Dabney O'Riordan*
Preethi Krishnamurthy
Osman Nawaz*
H. Gregory Baker
Lee A. Greenwood
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
*Not admitted in U.S. District Court for the S.D.N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          **Plaintiff,**<br><br>    -against-<br><br>**PREMIUM POINT INVESTMENTS LP,<br>ANILESH AHUJA a/k/a NEIL AHUJA,<br>AMIN MAJIDI, JEREMY SHOR, ASHISH DOLE,<br>and FRANK DINUCCI, JR.,**<br><br>          **Defendants.** | <u>**AMENDED COMPLAINT**</u><br><br>**18 Civ. 04145 (AJN)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendants Premium Point Investments L.P. ("Premium Point"), Anilesh Ahuja a/k/a Neil Ahuja ("Ahuja"), Amin Majidi ("Majidi"), Jeremy Shor ("Shor"), Ashish Dole ("Dole"), and Frank Dinucci, Jr. ("Dinucci") (together, "Defendants"), alleges as follows:

### SUMMARY

1. Defendant Premium Point, a Commission-registered investment adviser that managed billions of dollars in assets at its height, and the individual defendants engaged in a

fraudulent scheme to inflate the value of securities—at times by more than 100%—held by several private investment funds Premium Point advised.

2.       From at least September 2015 through March 2016 (the "Relevant Period"), Premium Point investment funds' performance was deteriorating and some of the funds' major investors were requesting large redemptions from the funds.

3.       Ahuja, Premium Point's majority owner and chief executive officer, and Majidi, the portfolio manager of one Premium Point investment fund, sought to hide the funds' poor performance, both to stem redemptions and to persuade investors to invest in a new Premium Point fund, by inflating the value of securities in the Premium Point funds.

4.       Pressured by Ahuja and Majidi, Shor and Dole—Premium Point traders—relied on two "levers" to inflate the values of securities held by the investment funds.

5.       First, Shor and Dole, with Ahuja's and Majidi's knowledge, obtained inflated price quotes on securities, or "marks," from at least Dinucci, a registered representative at a brokerage firm (the "Brokerage Firm").

6.       In return, Shor and Dole promised to send securities trades to the Brokerage Firm for which it would earn commissions.

7.       Premium Point then used these inflated price "marks" to calculate and report the funds' monthly valuations to investors.

8.       Second, Shor and Dole, again with Ahuja's and Majidi's knowledge, used "imputed" mid-point prices to inflate the values of the funds' securities.

9.       As Premium Point generally disclosed to investors, it used the mid-point price of each security—a price halfway between the bid price, the highest price at which a prospective buyer is willing to buy the security, and the ask price, the lowest price at which a prospective seller is willing to sell the security—in the funds' portfolios to value the investment funds.

10.     Unbeknownst to at least most investors, Premium Point itself routinely derived, or "imputed," the mid-point prices of securities, even where Premium Point could easily obtain a mid-point price for the security from a broker. To do so, Premium Point took a bid price for a particular security and added half the spread between the bid and ask prices on a broad sector of securities—not the spread on that particular security—to "impute" a mid-point price for that security.

11.     As Ahuja, Majidi, Shor, and Dole knew, this "imputed" mid-point practice routinely and significantly inflated the values of securities in the funds' portfolios, particularly during the Relevant Period.

12.     Indeed, in September 2011, a large potential fund-of-funds investor, contemplating investing in one of the funds, received a draft of a new Premium Point pricing policy. The policy disclosed that Premium Point would use an imputed mid-point price to value securities in that fund.

13.     The potential investor told Premium Point—in a communication conveyed to both Ahuja and Majidi—that the investor would not invest in the fund if Premium Point valued the fund's portfolio using imputed mid-point prices because that practice would give Premium Point too much discretion in the valuation process.

14.     At the investor's insistence, Majidi removed the imputed mid-point provision from Premium Point's draft pricing policy and never included it in any final pricing or valuation policy, and the investor subsequently invested a substantial amount in a Premium Point fund.

15.     Nevertheless, as Ahuja and Majidi knew, Premium Point continued to use imputed mid-point prices to value the funds for years, including throughout the Relevant Period, without telling that investor and at least most other investors.

16.     The Defendants' fraudulent valuation scheme resulted in Premium Point's reporting inflated month-end net asset values ("NAVs") and inflated month-end and annual performance for

the funds to existing and potential investors. These inflated valuations enabled Premium Point to receive excess fees.

17.    Ahuja and Majidi knowingly relied on the funds' inflated performance to deter investor redemptions and raise additional investor money for the funds.

18.    Ahuja further knowingly relied on the inflated performance figures for one of the funds to try to persuade investors to invest in a second version of that fund (which ultimately failed to materialize).

19.    The fraudulent scheme eventually collapsed as Premium Point faced difficulties in meeting investors' redemptions because it could not sell securities in the funds' portfolios at the inflated valuation prices and as the funds' auditor questioned Premium Point's valuations.

20.    Premium Point later revised the valuation of the funds' securities for the Relevant Period and determined that it had previously overvalued the funds. Based on the revised valuations, Premium Point had overvalued the funds by an average of over 14% per month during the Relevant Period.

## VIOLATIONS

21.    By virtue of the foregoing conduct and as alleged further herein:

(a)   Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) & (3)];

(b)   Premium Point, Ahuja, and Majidi violated Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-6(4)], and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)];

(c) Premium Point violated Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. § 275.206(4)-2];

(d) Ahuja and Majidi aided and abetted Premium Point's violations of Advisers Act Sections 206(1), 206(2), and 206(4) [15 U.S.C. § 80b-6(1), 80b-6(2) & 80b-6(4)], and Rule 206(4)-8(a)(2)thereunder [17 C.F.R. § 275.206(4)-8(a)(2)]; and

(e) Shor, Dole, and Dinucci aided and abetted Premium Point's, Ahuja's, and Majidi's violations of Advisers Act Sections 206(1), 206(2), and 206(4) [15 U.S.C. § 80b-6(1), 80b-6(2) & 80b-6(4)], and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)].

22.    Unless Defendants are permanently restrained and enjoined, they will again engage in the transactions, acts, practices, and courses of business set forth in this Complaint or in transactions, acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

23.    The Commission brings this action pursuant to authority conferred upon it by Securities Act Section 20(b) [15 U.S.C. § 77t(b)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Section 209(d) [15 U.S.C. § 80b-9(d)]. The Commission seeks a final judgment: (i) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (ii) requiring Defendants to disgorge all ill-gotten gains, together with prejudgment interest, received as a result of their violations; (iii) requiring Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Section 209 [15 U.S.C. § 80b-9]; and (iv) ordering any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

25.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

26.     Venue lies in this District under Securities Act Section 22(a) [15 US.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-1]. Defendants may be found in, are inhabitants of, or transact business in this District, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York, where Premium Point had its office during the Relevant Period.

## DEFENDANTS

27.     **Premium Point**, a Delaware limited partnership that Ahuja founded in 2008, is an investment adviser that has been registered with the Commission from April 2009 through at least April 2018, and with its principal place of business in New York, New York. From at least 2009 through 2017, Premium Point and/or its affiliates had custody of the assets of the investment funds that Premium Point advised based on access to the funds' securities.

28.     **Ahuja**, age 50, resides in New York, New York. Ahuja founded Premium Point and at all relevant times was its chief executive officer, chief investment officer, and majority owner.

29.     **Majidi**, age 52, resides in New York, New York. From November 2008 to June 2016, Premium Point employed Majidi, initially as its chief risk officer and, beginning in 2015, as the portfolio manager of one Premium Point fund. Majidi received a percentage of Premium Point's net annual income and any incentive fees.

30.     **Shor**, age 46, resides in New York, New York. From the spring of 2014 until he resigned in March 2016, Shor served as a director and trader of non-agency securities at Premium Point.[1]

31.     **Dole**, age 35, resides in White Plains, New York. Before, during, and after the Relevant Period, he worked for Premium Point, first in risk management and later as an associate director and trader of asset-backed securities.

32.     **Dinucci**, age 35, resides in New York, New York. Before, during, and after the Relevant Period, he served as a registered representative of the Brokerage Firm. On September 3, 2015, Dinucci entered into a deferred prosecution agreement with the Commission, in which he agreed, among other things, "to refrain for a period of one year…from any association with any broker [or] dealer." The one-year period ran from October 8, 2015 to October 8, 2016. On December 7, 2015, March 7, 2016, June 8, 2016, and September 6, 2016, Dinucci submitted to the Commission written certifications falsely certifying that he was "not associated with any broker [or] dealer," when he was in fact associated with the Brokerage Firm.

## OTHER RELEVANT ENTITIES

33.     **The Brokerage Firm** is a small, regional broker-dealer that was registered with the Commission at all relevant times.

34.     **Premium Point Master Mortgage Credit Fund, Ltd.** and **Premium Point Offshore Mortgage Credit Fund, Ltd.**—each incorporated in the Cayman Islands and currently in voluntary liquidation proceedings there—and **Premium Point Mortgage Credit Fund LP**,

---

[1]     "Non-agency" means that a government-sponsored enterprise, such as the Federal National Mortgage Association (known as Fannie Mae), did not guarantee the securities.

incorporated in Delaware, are a group of unregistered funds (collectively, the "Mortgage Credit Fund"), organized in a master-feeder structure.[2]

35.     **Premium Point Master New Issue Opportunity Fund, Ltd.** and **Premium Point Offshore New Issue Opportunity Fund, Ltd.**—each incorporated in the Cayman Islands and currently in voluntary liquidation proceedings there—and **Premium Point New Issue Opportunity Fund LP**, incorporated in Delaware, are a group of unregistered funds (collectively, the "New Issue Fund"), organized in a master-feeder structure.

## FACTS

### I.     Background

#### A.     Premium Point and the Funds

36.     During the Relevant Period, Premium Point described itself as "focused on investment opportunities in securities, mortgages, loans, real property, as well as[ ] consumer receivables."

37.     At all relevant times, the Mortgage Credit Fund invested in mortgage securities, including subprime and interest-only non-agency bonds.

38.     At all relevant times, the New Issue Fund invested in mortgage securities, including new-issue prime jumbo residential mortgage bonds.

39.     Premium Point received fees for its advisory services, partly based on the value of the assets in the funds it managed according to the fund valuations it provided.

40.     For example, on a quarterly basis, Premium Point received a management fee from each non-affiliated investor equal to 1.5% per annum of the value of the investor's investment in the

---

[2]     A "master-feeder structure" is a two-tiered structure in which investors invest their capital in a "feeder" fund, which in turn invests in a "master" fund, managed by the same investment adviser (or an affiliate), that buys and sells the assets.

Mortgage Credit Fund or the New Issue Fund (together, the "Funds"). Premium Point calculated the Funds' valuations—and, in turn, each investor's share of each of the Funds—through the methodology described below.

        **B.**    **Premium Point's Claimed Valuation Methodology**

    41.     In offering memoranda, limited partnership agreements, valuation policies, and other documents, Premium Point told the Funds' investors and prospective investors that Premium Point valued the Funds' assets in accordance with U.S. Generally Accepted Accounting Principles ("GAAP").

    42.     During at least the Relevant Period, Premium Point claimed that its valuation process sought to determine the fair value of the Funds' portfolio assets and liabilities.

    43.     Accounting Standards Codification Topic 820 ("Topic 820"), Fair Value Measurement, provides a framework for determining fair value in accordance with GAAP.

    44.     Topic 820 defines fair value (with the emphasis in the original) as "the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions (that is, an *exit price* at the measurement date from the perspective of a market participant that holds the asset or owns the liability)."

    45.     Premium Point's disclosures set forth procedures to determine fair value for the Funds' portfolio assets and liabilities.

    46.     From at least January 2012 to March 2016, Premium Point's valuation policy provided the following explanation of its valuation method for the relevant securities:

> Premium Point will query the pricing sources (both securities dealers and pricing vendors) directly and determine the price as follows: if five or more prices are received, the average of the prices (excluding the highest and lowest) price will be used as the fair market value for that security. If four, three, or two prices are received, the average of the prices will be used as the fair market

> value for that security. If one price is received, this price will be
> used as the fair market value for that security.

47.     Premium Point's month-end valuation practice from at least January 2012 to March 2016 was to value the Funds' securities at the midpoint between the bid price and the ask price.

48.     During at least this same time period, the Funds' offering materials—which Premium Point prepared and distributed to investors—stated that "securities which are not [ ] listed…shall be valued at the mean between the 'bid' and 'asked' price on the date of determination based on quotations obtained by the Fund or its delegate from one or more brokers or dealers regularly making markets in and issuing quotations for such securities."

49.     To value the Funds' securities during at least this same period, Premium Point typically used at least one third-party vendor and at least one broker-dealer that Premium Point traders selected to provide month-end price quotes.

50.     Premium Point used the price quotes it received from any such vendor and broker-dealer to calculate the Funds' NAVs and report them to investors.

## II.   Premium Point's Performance Problems and Target Performance Numbers

51.     Before and during the Relevant Period, both the Mortgage Credit Fund and the New Issue Fund suffered deteriorating performance.

52.     Indeed, in July 2015, Majidi told Shor: "We cannot take more NAV hits."

53.     In October 2015, Majidi told Shor, Dole, and another trader: "The losses we're posting are unsustainable. We're…going to go out of business."

54.     Also before and during the Relevant Period, certain major investors in the Mortgage Credit Fund began requesting large redemptions, which would shrink the fund's size, decrease Premium Point's fees, and require Premium Point to sell securities the fund held to satisfy those redemptions.

55.     Throughout at least 2015 and the first quarter of 2016, Ahuja and Majidi estimated both Funds' prior month's performance during the first few days of the following month.

56.     Ahuja and Majidi also analyzed the performance of competitor funds with investment strategies similar to that of the Funds.

57.     Ahuja and Majidi wanted the Funds' performance to track or exceed competitor funds' performance.

58.     For example, in July 2015, Majidi told Shor: "[W]e need to show performance…. [W]e're like the bottom third of hedge funds."

59.     Similarly, in October 2015, Majidi told Shor: "I mean, if we show down 3% this month [in one of our portfolios], game over…. [The investor] would do a complete redemption."

60.     Before and during the Relevant Period, Ahuja and Majidi received daily profit and loss figures for the Funds.

61.     Ahuja and Majidi created estimates of the performance they desired for the Funds for the preceding month and used those to set aggressive performance "targets" for the preceding month.

62.     Ahuja and Majidi then pressured Premium Point traders to meet these targets through the valuation process described below.

## III.   Ahuja, Majidi, and Shor Manipulated Premium Point's Valuation Process To Meet Performance Targets.

### A.     Premium Point Used Sham Broker Quotes To Inflate the Funds' Valuations.

63.     Before and during the Relevant Period, Ahuja and Majidi encouraged Shor and Dole to seek from friendly brokers inflated price quotations, or "marks," on bonds that would then be used to inflate the Funds' valuations.

64.     Shor and Dole arranged with the Brokerage Firm, through at least Dinucci, to obtain sham marks on bonds.

65.     In return, Shor and Dole promised that Premium Point would send trades to the Brokerage Firm on which the latter would earn commissions.

66.     Late in Premium Point's monthly valuation process—after Premium Point had already received price quotes from other broker-dealers or independent pricing services for the securities in the Funds' portfolios and once Premium Point had determined the marks needed to meet Ahuja's and Majidi's performance targets—Shor and Dole told Dinucci the prices they wanted to see for certain bonds in the Funds' portfolios.

67.     In return, the Brokerage Firm essentially gave Shor and Dole whatever marks they wanted for those bonds.

68.     For example, in a September 2015 text message, Dinucci told Shor that Dole needed to send more trades to the Brokerage Firm if Dole wanted Dinucci to keep providing sham marks: "[Dole] gonna have to show me/[Brokerage Firm] some more love if he thinks I'm gonna just mark all those bonds where he wants them."

69.     In another text message the same month, Dinucci similarly told Shor: "Tell Ashish dog [Dole] to chuck me a damn trade if I keep marking up all his bonds ha."

70.     Similarly, in a conversation with Shor during the Relevant Period, another Premium Point employee noted that the Brokerage Firm "basically…hold[s] off sending us marks until we get an idea of where our marks are coming in, and then…they give us basically marks w[h]ere we want them. Same with bid-ask spreads."

71.     In the same conversation, Shor called that practice "very wrong…obviously."

72.     As Defendants knew, Premium Point then used the Brokerage Firm's sham marks to value the Funds' securities.

73.     Indeed, Dole made clear to Ahuja that, to meet the performance target through the valuation process, he and Shor could get marks on bonds at essentially any price he and Shor wanted from the friendly broker.

74.     Similarly, Dole told Majidi in a text message that Dinucci "can of course mark bonds anywhere."

75.     Ahuja and Majidi nevertheless encouraged Shor and Dole to obtain inflated marks from the Brokerage Firm for valuation purposes.

**B.     Premium Point Misused Imputed Mid-Point Prices to Value Portfolios.**

**1.     Premium Point Misled an Investor About Imputed Mid-Point Prices.**

76.     In approximately September 2011, a large potential fund-of-funds investor conducted an operational due diligence review on Premium Point and the Mortgage Credit Fund to decide whether to invest in the Mortgage Credit Fund.

77.     The potential investor told Premium Point that it generally sought "a valuation process [that was] more perfectly independent" from the Premium Point managers of the Mortgage Credit Fund to ensure that Premium Point valued the fund appropriately.

78.     On September 19, 2011, Premium Point sent the potential investor a draft Pricing Policy describing Premium Point's method for valuing the securities in the Funds' portfolios.

79.     That draft policy stated in relevant part: "Pricing will correspond to 3pm mid-market levels on the last business day of each month…. In cases where we are given only a bid side price, the Investment Manager may add one half of bid/offer spreads to the bid price to establish a mid-market price."[3]

---

[3]     In this context, "offer" price is synonymous with "ask" price.

80.     On September 20, 2011, the potential investor's managing director emailed Premium Point and inquired (with emphasis added):

> Can you strike new language in paragraph 3 that states, 'In cases where we are given only a bid side price, the IM may add one half of bid/offer spreads to the bid price to establish a mid-market price'? *This is very unusual and we have never seen in a valuation policy before. Our initial comments were to ask for less manager involvement in valuation process, not more....* Has this alteration of broker quotes been occurring all along? If so, this was not disclosed during the valuation discussions with...Amin [Majidi]...?

81.     The same day, the Premium Point recipient of the email forwarded it to Ahuja and Majidi.

82.     Later that day, in response to the potential investor's request, Majidi revised the draft policy to remove the sentence about adding half of the bid/offer spread to the bid price to establish a mid-point price, or an imputed mid-point. Majidi noted his hope that the revisions were "acceptable" to the potential investor.

83.     The same day, at Majidi's instruction, Premium Point conveyed the revised proposed pricing policy to the potential investor.

84.     Based on Premium Point's communications with the potential investor and the revised pricing policy, the potential investor understood that Premium Point would not use an imputed mid-point price to value the securities in the Mortgage Credit Fund's portfolio.

85.     In approximately 2012, the potential investor invested more than $100 million with Premium Point, including in the Mortgage Credit Fund.

86.     From that time until at least March 2016, Premium Point's pricing policy and other investor documents never disclosed to this investor and to at least most other investors that Premium Point valued the Funds' portfolios by deriving imputed mid-point prices through adding half of a bid/ask spread to a bid price.

87.     Nevertheless, as Ahuja and Majidi knew, Premium Point continued to use imputed mid-point prices, including by using bond sector spreads, to value the securities in the Funds' portfolios from at least 2012 through March 2016, as described below.

### 2.     Premium Point Used Imputed Mid-Point Prices To Inflate the Funds' Valuations.

88.     Before and during the Relevant Period, Premium Point used several independent, paid pricing services to price certain securities in the Funds' portfolios, in addition to obtaining prices or marks on securities from broker-dealers, for valuation purposes.

89.     From at least January 2012 to February 2016, several independent pricing services that Premium Point used, including Premium Point's primary pricing service, provided only bid-side marks for bonds.

90.     To value securities at the midpoint between the bid and ask prices, Premium Point calculated an imputed mid-point price based on the bid prices it received.

91.     Premium Point solicited data from various sources regarding the bid/ask spread in particular bond sectors or categories (such as Subprime and Prime RMBS 2.0), rather than individual bonds.[4]

92.     Premium Point then added half of the bid/ask spreads for bonds in the corresponding bond sector to the bid-side prices for the individual bonds in order to impute a mid-point value for an individual bond.

93.     As Ahuja, Majidi, Shor, and Dole understood, Premium Point's imputed mid-point valuation practice resulted in increasing bond valuations in sectors with wide bid/ask spreads—for

---

[4]     The "Subprime" category of bonds typically refers to the entire sector of mortgage-backed securities created from subprime mortgages (generally, borrowers with lower credit ratings), and the "Prime" category of bonds typically refers to the entire sector of mortgage-backed securities created from prime mortgages (generally, borrowers with higher credit ratings).

example, spreads often widened due to less liquidity—even when individual bond prices in that sector were stagnant or declining.

94.     The example in paragraphs 95 through 102 below illustrates the imputed mid-point valuation practice's overvaluation of a bond (named SAMI 2006-AR8X) in the Mortgage Credit Fund's portfolio for the month ending September 30, 2015.

95.     For this bond, Premium Point obtained prices, or marks, from three institutions: (1) a small broker-dealer registered with the Commission, (2) an independent pricing service Premium Point used, and (3) the Brokerage Firm.

96.     The small broker-dealer provided a mid-point price of $2.63 for the bond, and the pricing service provided a bid-side price of $2.36 for the same bond.

97.     The Brokerage Firm—based on the arrangement described above in Section III.A—provided an inflated bid-side price of $4.00 for the same bond: almost 70% higher than the bid-side price Premium Point had received from its pricing service.

98.     Premium Point also obtained bid/ask spread data for the bond's sector (POA IO, or Payment Option ARM Interest Only) from both the Brokerage Firm and the same small broker-dealer that had provided a mid-point price on the bond.[5]

99.     The Brokerage Firm provided a bid/ask spread of $4, and the other small broker-dealer provided a bid/ask spread of $3.375.

100.     Premium Point next averaged these two bid/ask spreads to arrive at a single bid/ask spread of $3.68 for the bond's sector.

---

[5]     Shor did not tell the Brokerage Firm or the other small broker-dealer that he or Premium Point would use the bid/ask spreads he obtained from them for valuation purposes. Instead, Shor suggested in an email to the small broker-dealer that he used the spreads for internal reports at Premium Point.

101.    Premium Point then used this bid/ask spread to further inflate the bond's valuation: First, Premium Point added half of the $3.68 bid/ask spread for the bond's sector (or $1.84) to the two bid-side prices obtained from the pricing service and the Brokerage Firm. Premium Point thereby turned the pricing service's $2.36 bid-price mark into a $4.20 imputed mid-point price and the Brokerage Firm's already-inflated $4.00 bid-price mark into a $5.84 imputed mid-point price. Next, Premium Point averaged together these two imputed mid-point prices—$4.20 and $5.84, respectively—and the pricing service's original mid-point price of $2.63 for the bond. Premium Point thus valued the bond, for purposes of investor disclosure and its own management fees, at the resulting average mid-point price: $4.22.

102.    Premium Point's $4.22 valuation for the bond was 60% higher than the mid-point price from the small broker-dealer and over 78% higher than the bid-side price from the independent pricing service.

103.    The misuse of sector spreads for purposes of imputed mid-point valuations became particularly apparent when Premium Point received actual mid-point price marks on bonds from brokers, as reflected in the example above.

104.    In internal Premium Point communications, Shor described the use of spreads as a "big lever" to overvalue the Funds' portfolios.

105.    In one conversation with Majidi in approximately January 2016, Shor said: "I am overmarked by a bunch of millions… I am at 3 [dollar spread] on 6 dollar bonds…"

106.    In that same conversation with Majidi, Shor made clear that, while bid-side prices for bonds were falling, Premium Point's valuations of the same bonds were rising because of its application of sector spreads to price the bonds.

107.    Ahuja similarly knew that Premium Point's imputed mid-point pricing practice overvalued bonds in the Funds' portfolios, based on conversations with at least Dole and a former portfolio manager at Premium Point both before and during the Relevant Period.

108.    Furthermore, in approximately November 2015, Shor asked the Brokerage Firm and another broker-dealer to re-label the mid-point price marks they had been providing to Premium Point on specific bonds as bid-side price marks.

109.    This enabled Premium Point to then impute a mid-point price for these bonds—rather than having to accept the mid-point prices received from both brokerage firms without adding half of a bid/ask sector spread—to increase Premium Point's valuation for a range of bonds, which Shor then did.

110.    In February 2016, Premium Point's primary pricing service began providing both bid- and mid-level price marks for the first time.

111.    The pricing service's mid-point price marks were often significantly lower than Premium Point's imputed mid-point price marks.

112.    For example, for the same bond described above in 95 through 102 but for the month ending February 29, 2016, the independent pricing service provided Premium Point with a mid-point price of $2.61. Yet Premium Point, using an imputed mid-point price, valued the same bond that month at $6.57—over 2.5 times the pricing service's mid-point price.

113.    At times, Premium Point used bid/ask spreads almost as large as the bid prices themselves to calculate imputed mid-point prices that Premium Point then used to value the bonds in the Funds' portfolios.

114.    Also at times, Premium Point's use of bid/ask spreads increased the imputed mid-point prices Premium Point used for valuation even though Premium Point had actually received bid prices that had declined from the previous month.

18

115.	From at least 2012 through March 2016, Premium Point did not disclose to at least the vast majority of the Funds' investors that it used the imputed mid-point practice described above to value securities held by the Funds.

**C.	These Schemes Inflated the Funds' Valuations and Premium Point's Fees.**

116.	Each month during at least the Relevant Period, Premium Point communicated both its valuation estimates and final month-end NAVs for each of the Funds to their respective investors.

117.	The schemes described above resulted in Premium Point valuing the Funds' portfolios materially above their fair value under GAAP during at least the Relevant Period, as Ahuja, Majidi, and Shor knew or recklessly disregarded.

118.	Because the schemes described above inflated the Funds' NAVs, Premium Point charged inflated fees to the Funds during at least the Relevant Period.

**D.	Premium Point Used Inflated Valuations to Try to Raise Investor Money for a New Fund and Stem Redemptions.**

119.	In 2015, Ahuja tried to raise money from investors for a second version of the New Issue Fund.

120.	Ahuja wanted to show potential investors that the New Issue Fund had a positive performance track record.

121.	During 2015, Ahuja pressured Dole to inflate the New Issue Fund's valuations.

122.	Ahuja used the New Issue Fund's inflated valuations to market the new fund (which ultimately failed to materialize) to prospective investors.

123.	In mid- to late 2015, Premium Point needed to raise cash by selling some securities in the Mortgage Credit Fund because of large investor redemptions from the fund.

124.     During that same time, at least partly because Premium Point had overvalued securities in the Mortgage Credit Fund, Premium Point sold many securities held by that fund at prices significantly below Premium Point's valuation of the same securities.

125.     Premium Point ran an internal price variance report showing the Funds' actual trades versus Premium Point's valuations of the same securities.

126.     Majidi did not want Shor to sell certain securities because the transactions would appear on the price variance report.

127.     Ahuja and Majidi communicated with Shor about the prices at which Premium Point was selling securities and the expected losses for future sales when compared to Premium Point's higher valuations for those same securities.

128.     In essence, Ahuja, Majidi, and Shor discussed the extent of Premium Point's overvaluation of securities and its impact on Premium Point's performance.

129.      To deter investors from submitting additional redemption requests, Ahuja and Majidi set even higher, unrealistic performance targets for the Mortgage Credit Fund and continued to pressure Dole and Shor to inflate valuations.

130.     During at least the Relevant Period, while the Mortgage Credit Fund sustained significant redemptions, it continued to receive additional investor funds through subscriptions.

**IV.    The Scheme Collapsed, and Premium Point Materially Revised Values Downwards.**

131.     In approximately April 2016, during its audit of the Funds' 2015 year-end financial statements, the Funds' auditor became concerned that Premium Point had significantly overstated the Funds' valuations and began a review.

132.     In April 2016, Premium Point informed the Funds' investors that it intended to restate NAVs for late 2015 and later periods.

133.    Premium Point ultimately revised its valuation figures for the Relevant Period and determined that, at least during that period, the Funds had been overvalued.

134.    Based on Premium Point's revised valuation figures, Premium Point had overvalued each of the Funds monthly by over 14% on average during the Relevant Period.

135.    For example, for the month ending December 31, 2015, Premium Point determined that the Mortgage Credit Fund had been overvalued by over $50 million and the New Issue Fund had been overvalued by $40 million.

136.    Indeed, for that same month, Premium Point had overvalued the bond described in 95 through 102 above (among many others) by more than $7 million, both by using a sham, inflated bid-side price from the Brokerage Firm and imputing a mid-point price using a bid/ask sector spread.

137.    Ultimately, for fiscal years 2015 and 2016, Premium Point failed to obtain any annual audit of the Funds (much less an annual audit by an independent public accountant registered with and subject to regular inspection by the Public Company Accounting Oversight Board ("PCAOB")).

138.    Nor did Premium Point obtain an annual surprise examination of the Funds by an independent public accountant for fiscal years 2015 or 2016.

139.    Premium Point further failed to distribute audited financial statements to the Funds' investors for fiscal years 2015 and 2016.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder**
**(All Defendants)**

140.    Paragraphs 1 through 139 are re-alleged and incorporated by reference as if fully set forth herein.

141.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce,

or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (i) employed devices, schemes, or artifices to defraud or (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

142.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have each violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(1) and (3)
### (All Defendants)

143.    Paragraphs 1 through 139 are re-alleged and incorporated by reference as if fully set forth herein.

144.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly or recklessly have: (i) employed devices, schemes or artifices to defraud or (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

145.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)].

## THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)
### (Premium Point, Ahuja, and Majidi)

146.    Paragraphs 1 through 139 are re-alleged and incorporated by reference as if fully set forth herein.

147.    At all relevant times, defendants Premium Point, Ahuja, and Majidi were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

148.    Defendants Premium Point, Ahuja, and Majidi, directly or indirectly, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, have: (i) knowingly or recklessly employed devices, schemes, or artifices to defraud clients or prospective clients, and/or (ii) knowingly, recklessly, or negligently engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

149.    By reason of the foregoing, Defendants Premium Point, Ahuja, and Majidi, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### FOURTH CLAIM FOR RELIEF
### Violations of Advisers Act Section 206(4) and Rule 206(4)-8(a)(2) Thereunder
### (Premium Point, Ahuja, and Majidi)

150.    Paragraphs 1 through 139 are re-alleged and incorporated by reference as if fully set forth herein.

151.    Defendants Premium Point, Ahuja, and Majidi, directly or indirectly, while acting as investment advisers to a pooled investment vehicle, knowingly, recklessly, or negligently engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative, with respect to an investor or prospective investor in the pooled investment vehicle.

152.    By reason of the foregoing, Defendants Premium Point, Ahuja, and Majidi, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)].

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Advisers Act Sections 206(1) and (2)
### (Ahuja, Majidi, Shor, Dole, and Dinucci)

153.      Paragraphs 1 through 139 are re-alleged and incorporated by reference as if fully set forth herein.

154.      Defendants Premium Point, Ahuja, and Majidi, directly or indirectly, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, have: (i) knowingly or recklessly employed devices, schemes, or artifices to defraud clients or prospective clients, and/or (ii) knowingly, recklessly, or negligently engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

155.      By reason of the foregoing, Ahuja and Majidi, directly or indirectly, singly or in concert, aided and abetted Premium Point's violations of Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b- 6(1) and 80b-6(2)] by knowingly or recklessly providing substantial assistance to Premium Point's violations, and Shor, Dole, and Dinucci, directly or indirectly, singly or in concert, aided and abetted Premium Point's, Ahuja's, and/or Majidi's violations of Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b- 6(1) and 80b-6(2)] by knowingly or recklessly providing substantial assistance to Premium Point's, Ahuja's, and/or Majidi's violations.

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Advisers Act Section 206(4) and Rule 206(4)-8(a)(2)
### (Ahuja, Majidi, Shor, Dole, and Dinucci)

156.      Paragraphs 1 through 139 are re-alleged and incorporated by reference as if fully set forth herein

157.      Premium Point, Ahuja, and Majidi, while acting as investment advisers to a pooled investment vehicle, knowingly, recklessly or negligently engaged in acts, practices or courses of

business which are fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the pooled investment vehicle.

158.    By reason of the foregoing, Ahuja and Majidi, directly or indirectly, singly or in concert, aided and abetted Premium Point's violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)] by knowingly or recklessly providing substantial assistance to Premium Point's violations, and Shor, Dole, and Dinucci, directly or indirectly, singly or in concert, aided and abetted Premium Point's, Ahuja's, and/or Majidi's violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)] by knowingly or recklessly providing substantial assistance to Premium Point's, Ahuja's, and/or Majidi's violations.

## SEVENTH CLAIM FOR RELIEF
### Violations of Advisers Act Section 206(4) and Rule 206(4)-2 thereunder
### (Premium Point)

159.    Paragraphs 1 through 139 are re-alleged and incorporated by reference as if fully set forth herein.

160.    Premium Point, an investment adviser registered with the Commission at all relevant times, had custody of the Funds' assets under the definition set forth in Rule 206(4)-2(d)(2) [17 C.F.R. § 275.206(4)-2(d)(2)].

161.    For fiscal years 2015 and 2016, Premium Point (a) failed to obtain an annual audit of the Funds by an independent public accountant registered with and subject to regular inspection by the PCAOB, (b) failed to obtain a surprise examination of the Funds by an independent public accountant, and (c) failed to distribute audited financial statements to Fund investors within 120 days of the end of the Funds' fiscal years.

162.    By reason of the foregoing, Premium Point, directly or indirectly, has violated and unless enjoined will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. § 275.206(4)-2].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests the Court enter a Final Judgment:

### I.

Permanently enjoining Premium Point and its officers, agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]; Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and (3)]; Advisers Act Sections 206(1), (2), and (4) [15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-6(4)]; and Rules 206(4)-2 [17 C.F.R. § 275.206(4)-2] and 206(4)-8(a)(2) [17 C.F.R. § 275.206(4)-8(a)(2)] thereunder;

### II.

Permanently enjoining Ahuja and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]; Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and (3)]; Advisers Act Sections 206(1), (2), and (4) [15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-6(4)]; and Rule 206(4)-8(a)(2) [17 C.F.R. § 275.206(4)-8(a)(2)] thereunder;

### III.

Permanently enjoining Majidi and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]; Rules 10b-5(a) and (c) thereunder [17 C.F.R.

§§ 240.10b-5(a) and (c)]; Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and (3)];

Advisers Act Sections 206(1), (2), and (4) [15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-6(4)]; and Rule

206(4)-8(a)(2) [17 C.F.R. § 275.206(4)-8(a)(2)] thereunder;

## IV.

Permanently enjoining Shor and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly,

Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]; Rules 10b-5(a) and (c) thereunder [17 C.F.R.

§§ 240.10b-5(a) and (c)]; Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and (3)];

Advisers Act Sections 206(1), (2), and (4) [15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-6(4)]; and Rule

206(4)-8(a)(2) [17 C.F.R. § 275.206(4)-8(a)(2)] thereunder;

## V.

Permanently enjoining Dole and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly,

Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]; Rules 10b-5(a) and (c) thereunder [17 C.F.R.

§§ 240.10b-5(a) and (c)]; Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and (3)];

Advisers Act Sections 206(1), (2), and (4) [15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-6(4)]; and Rule

206(4)-8(a)(2) [17 C.F.R. § 275.206(4)-8(a)(2)] thereunder;

## VI.

Permanently enjoining Dinucci and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly,

Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]; Rules 10b-5(a) and (c) thereunder [17 C.F.R.

§§ 240.10b-5(a) and (c)]; Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and (3)];

Advisers Act Sections 206(1), (2), and (4) [15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-6(4)]; and Rule

206(4)-8(a)(2) [17 C.F.R. § 275.206(4)-8(a)(2)] thereunder;

## VII.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with

prejudgment interest thereon, as a result of the alleged violations;

## VIII.

Ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15

U.S.C. § 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e)

[15 U.S.C. § 80b-9(e)];

## IX.

Granting any other and further relief this Court deems just and appropriate.

Dated:   November 19, 2018
         New York, New York

By: _____

Daniel Michael
Preethi Krishnamurthy
H. Gregory Baker
Lee A. Greenwood
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
Email: krishnamurthyp@sec.gov

Of Counsel:

C. Dabney O'Riordan*
Securities and Exchange Commission
444 South Flower Street, Suite 900
Los Angeles, California 90071
Phone: 323-965-3316
Email: oriordand@sec.gov

Osman Nawaz*
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400

New York, New York 10281-1022
Phone: 212-336-0169
Email: nawazo@sec.gov

*Not admitted in U.S. District Court for the S.D.N.Y.